DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Otis Edwards, appeals the March 1, 2001 judgment entry of the Erie County Court of Common Pleas which, following a jury trial, found appellant guilty of murder, felonious assault, tampering with evidence, and gross abuse of a corpse. The court ordered appellant to serve life in prison for murder (the murder and felonious assault counts merged for sentencing) with no parole eligibility for fifteen years; four to ten years for tampering with evidence; and three to five years for gross abuse of a corpse. The sentences were ordered to be served consecutively. This appeal followed.
 {¶ 2} The relevant facts are as follows. On March 12, 1993, between 8:00 and 9:00 p.m., the victim, Linda Robertson, returned to her home at 419 Franklin Street, Sandusky, Erie County, Ohio, following a job interview in Bowling Green, Ohio. Appellant, who had been romantically involved with Robertson, arrived at Robertson's home approximately ten minutes thereafter. After a brief conversation, it was agreed that Robertson would walk down to appellant's house, which was five houses away. Robertson left her home at 9:30 p.m. and was never again seen alive.
 {¶ 3} On November 7, 1998, Robertson's skeletal remains were recovered from the Barnes Nursery property in Sandusky, Ohio; Robertson had been wrapped in a blanket, carpet and plastic and buried. On April 13, 2000, appellant was indicted for murder, felonious assault, tampering with evidence and gross abuse of a corpse, and entered a not guilty plea.
 {¶ 4} A jury trial commenced on February 13, 2001, and the state presented the following evidence. Mary Gowitzka testified that in March 1993, she lived with Robertson and her minor son. Gowitzka stated that, prior to January 1993, Robertson lived with appellant approximately four or five houses away. Gowitzka testified that appellant came to their house often and that he did not have a telephone.
 {¶ 5} Gowitzka testified that on March 12, 1993, Robertson, driven by her friend, Ron Asberry, went to Bowling Green, Ohio, for a job interview and to look for a place to live. According to Gowitzka, Robertson wanted to move to be closer to her family. Robertson and Asberry returned at approximately 9:00 p.m. that evening.
 {¶ 6} Shortly after their return, appellant arrived and Robertson agreed to go to his house for some ice cream. Robertson left the house at approximately 9:30 p.m. promising her son that she would return before he went to bed. Gowitzka testified that just before midnight appellant telephoned and asked where Robertson was; Gowitzka stated that this was odd because appellant did not have a telephone and generally just walked to their house. Gowitzka indicated that she did not know where he was calling from.
 {¶ 7} On March 14, 1993, Gowitzka contacted the police because she was concerned that Robertson had not come home. Gowitzka described that Robertson had been wearing black sweatpants, a green sweatshirt, white tennis shoes and a red and black coat.
 {¶ 8} At some point after March 14, appellant came to Gowitzka's house with sexually explicit photographs of Robertson and a former boyfriend which appellant claimed were left at his house. Gowitzka testified that on March 12, 1993, the photographs were in Robertson's bottom dresser drawer in a brown bag. Gowitzka indicated that she was unaware of a break-in at her home but did notice that appellant had a set of keys that resembled Robertson's. The keychain had a photograph of Robertson, her children and her grandchild. According to Gowitzka, when she questioned appellant about the keychain he indicated that Robertson gave him the photograph. Gowitzka stated that she saw that Robertson had her keys when she left for appellant's house on March 12, 1993.
 {¶ 9} Gowitzka then identified the blanket that was found with Robertson's remains as being at appellant's residence when Robertson lived with him. Gowitzka stated that when Robertson moved in with her, the blanket stayed at appellant's. Gowitzka also identified, as Robertson's, a gold necklace and a watch that were found with the body.
 {¶ 10} During cross-examination, Gowitzka acknowledged that the police never searched her home or car. Gowitzka also noted that appellant was going to put up flyers about Robertson's disappearance and that appellant had actively searched for her.
 {¶ 11} Robertson's son, nine at the time of Robertson's disappearance, testified next. Robertson's son identified the blanket that was found with the body as the one he and his mother had when they lived with appellant. He stated that when they moved in with Gowitzka, the blanket stayed at appellant's residence.
 {¶ 12} Jenny Criner, Robertson's sister, testified that on March 12, 1993, Robertson and Ron Asberry came to her home in Liberty Center, Ohio, about 20 minutes from Bowling Green. Robertson showered and dressed at Criner's and went to Wal-Mart for her interview. Criner stated that following the interview, Robertson went apartment hunting. Robertson and Asberry left Criner's home at approximately 6:30 p.m.
 {¶ 13} Criner testified that appellant asked her: "How do you make somebody love you." Criner responded that you cannot make someone love you. Appellant then stated: "[W]ell, if I can't have her, nobody will."
 {¶ 14} Criner also identified the blanket found with Robertson as being from appellant's house. She identified Robertson's gold necklace.
 {¶ 15} During cross-examination, Criner was questioned regarding an ex-boyfriend of Robertson, James Young, who had been working in the Sandusky area at the time of Robertson's disappearance. Young had contacted Criner's brother and was trying to determine where appellant put Robertson's body. Young suggested that appellant may have put her in a ditch where some pipeline was being laid.
 {¶ 16} Ron Asberry next testified that he drove Robertson to Criner's house and to her Wal-Mart interview. Asberry stated that they returned to Sandusky at 8:05 p.m. According to Asberry, approximately five minutes after their return, appellant arrived at the home. Appellant and Robertson talked in the kitchen for about ten minutes and, as appellant was leaving, Robertson indicated that she would be down to his house shortly. Asberry testified that he had seen Judy Stoll's Ford Escort outside and appellant indicated to him that he had borrowed it that day to "do some running."
 {¶ 17} When cross-examined, Asberry acknowledged that he and Robertson had been involved in a physical relationship and that Asberry wished to renew the relationship and move with Robertson to Bowling Green. Though questioned by the police, Asberry's home and car were not searched.
 {¶ 18} Sandusky Police Department Detective Helen A. Prosowski testified that she spoke with Gowitzka, on March 14, 1993, regarding Robertson's disappearance. On the same date, appellant spoke with her about the disappearance. According to Prosowski, appellant "was really anxious" and just "didn't seem himself." Appellant returned to the police station the following two days inquiring if they had learned anything.
 {¶ 19} On March 18, 1993, appellant returned to the police department and told Prosowski that he had a dream where he saw Robertson on a loveseat with a pale white face and hands. Appellant stated that he believed that Robertson was dead.
 {¶ 20} Prosowski explained that during the investigation she spoke with many individuals. On March 21, 1993, Prosowski and Sandusky Police Officer Ron Snyder responded to 313 Market Street, known as "Wino's Alley," where they recovered a pair of work boots, size 11 1/2, and Robertson's coat.
 {¶ 21} Prosowski stated that she was still at Wino's Alley when appellant arrived and indicated that the boots resembled his boots which were kept on his back porch. Appellant attempted to try on the boots but quit stating that they might be too small. Appellant later reported that his boots were, in fact, missing.
 {¶ 22} During cross-examination, Prosowski was questioned regarding alleged sightings of Robertson after March 12, 1993; she stated that they were just reports of people who purportedly looked like Robertson. Prosowski was also questioned as to certain items that were sent to the Bureau of Criminal Investigations ("BCI") for testing. Prosowski stated that Robertson's blood was not found on appellant's trousers, Stoll's trunk liner, Robertson's coat or the work boots. Prosowski also confirmed that the soil on the boots did not match the soil where Robertson was found. Prosowski testified that a blue nylon fiber found on a work boot was consistent with the fiber in Stoll's vehicle. Finally, Prosowski indicated that they found nothing at appellant's house to match the tape and paint on the plastic sheeting found with Robertson's body.
 {¶ 23} Sandusky Police Detective Curt Muehling testified that he interviewed appellant on March 22 and March 31, 1993. The videotaped interviews were played for the jury in chronological order.
 {¶ 24} At the March 22, 1993 interview, appellant stated that on the night of March 12, 1993, Robertson was supposed to come to his home for ice cream but never arrived. Appellant stated that he had a dream where he saw Robertson sitting on his loveseat and she was white from the neck up and had white hands and legs. Appellant then stated that Robertson asked him why she could not move her hands or legs and that she heard a train.
 {¶ 25} Appellant explained that the dream prompted him to search for Robertson up and down a stretch of railroad tracks from Cleveland Road to Osborn Park. Appellant also stated that he traveled to Erie, Pennsylvania, Chicago, Illinois, and Bowling Green, Ohio, looking for Robertson; he borrowed Debbie DeLeon's son's car for the excursion.
 {¶ 26} During the second interview, Muehling questioned appellant as to why he lied about borrowing Debbie DeLeon's or her son's car. Appellant admitted he lied and had instructed Debbie DeLeon to lie, he had used Judy Stoll's car but did not want to get her involved.
 {¶ 27} Muehling and Sandusky Police Officer Max Jarrett indicated that they believed that appellant killed Robertson and requested that he confess so Robertson could have a proper funeral. Appellant insisted that he did not kill her.
 {¶ 28} Muehling further testified that in 1994, prompted by information from a psychic, he and others conducted a search for Robertson's body at a pig farm in Huron Township. The psychic's description of the location combined with the fact that appellant had worked at the pig farm led police to search that particular area.
 {¶ 29} Roy Prewitt testified that in 1993, as a lieutenant with the Sandusky Police Department, he became involved in the Robertson investigation. Prewitt stated that during a search of appellant's house he confiscated a set of keys which worked in Robertson's door. Prewitt further testified that appellant gave him a set of photographs of Robertson involved in sexual acts with Chester Rowe. According to Prewitt, appellant told him that someone had taken the photographs from Robertson's dresser drawer, broken into his home and placed them in various places. Prewitt testified that there was no evidence of forced entry into appellant's home, and that the door handle appeared to have been taken off from the inside.
 {¶ 30} During cross-examination, Prewitt testified that appellant told him that the key fitting Robertson's front door was, in fact, from his prior residence at 432 East Washington Street. Prewitt acknowledged that they tested it and found that the key worked in both locks.
 {¶ 31} Erie County Sheriff's Deputy Captain Paul Sigsworth testified that on November 7, 1998, he responded to a call that suspected human remains had been recovered at Barnes Nursery. Sigsworth observed a bundle and, through a hole in the material, saw what he believed was a sweatpants' waistband and what appeared to be a human skull.
 {¶ 32} Sigsworth stated that Robertson's body was found approximately 200 yards west of the pig farm. The entire bundle was placed in a body bag and transported to the Providence Hospital Emergency Room. At the hospital, Sigsworth observed that the clothing, dental plate, and necklace matched the description of Robertson in the police report.
 {¶ 33} Sandusky Police Captain Charles Sams testified that approximately one month after the body was found he went to the site and took soil samples. The samples were compared to the dirt found in Stoll's vehicle and to the dirt found on the boots recovered at Wino's Alley.
 {¶ 34} The owner of Barnes Nursery, Robert W. Barnes, testified that part of their business is selling certain types of soil. Barnes described that from 1993 to 1998, when Robertson's body was found, there could have been 10 to 15 different types of soil in a 200 or 300 foot area. Barnes testified that the body may have never been uncovered if they had not been trying to alleviate a water drainage problem.
 {¶ 35} Lucas County Deputy Coroner Dr. Cynthia Beisser, testified that on November 8, 1998, she received human remains from Erie County. Beisser stated that the skeleton was female and described the clothing and jewelry. Beisser testified that she was unable to determine the cause of death but that the manner of death was a homicide. Beisser based her conclusion on the way the body was wrapped up and buried in an "out of the way place." Beisser acknowledged that she could not determine when the person died and that it could have been as late as 1997.
 {¶ 36} Dr. John Stewart, a forensic examiner for the FBI, testified that he conducted a DNA comparison of a bone from the remains and a blood sample from Norma Robertson, Linda Robertson's mother. Stewart testified that the results determined that he could not eliminate Robertson from contributing the bone sample. He stated that 99.8 percent of the population could be excluded.
 {¶ 37} FBI employee, Karen Lanning, testified that the blue fiber she took from the boot found at Wino's Alley matched a carpet fiber from Judy Stoll's vehicle. Ronald Menold, also of the FBI, testified that he worked with Lanning and performed additional chemical tests on the fibers and found them to be consistent.
 {¶ 38} Cheryl Silcox testified that while working as a serologist for the BCI she performed a luminol blood test on Stoll's trunk liner. Silcox testified that several areas "faintly luminesced" which is indicative of the presence of blood. Silcox stated that she retested the liner with a less sensitive agent and that the test was negative. Silcox further indicated that when she was performing the tests she noticed the smell of lemon or "Mr. Clean."
 {¶ 39} During cross-examination, Silcox acknowledged that several other items including the work boots, men's trousers, and the red and black coat tested negative for blood. Silcox further stated that, as to the trunk liner, no additional testing was done to identify the source of the blood.
 {¶ 40} Appellant's ex-girlfriend, Connie Wallace, testified that she had lived with appellant. Wallace stated that in March 1989, she went to the Sandusky Police Department after appellant rolled her up in carpet and threatened to take her to the landfill. Wallace stated that every time she and appellant argued he would threaten to kill her; Wallace stated that the arguments were over her wanting to leave him. Wallace testified that she told Lieutenant Prewitt that Robertson might be out at the pig farm.
 {¶ 41} Tracy Barnhart testified that she dated appellant towards the end of 1994. Barnhart stated that she asked appellant why he murdered Robertson and his written response was "For Linda I did it." The letter containing this statement was admitted into evidence. Barnhart did acknowledge that she received letters from appellant when she was in the county jail. She also testified that she called the FBI stating that she had some information regarding drug activity but she really wanted to show the agent the letters.
 {¶ 42} Barnhart was questioned as to why the letter had "For Linda I did it." written alone at the bottom of the letter. Again, Barnhart indicated that it was in response to what she had written him. Barnhart also admitted that she had gone to prison for forgery. She denied calling the FBI in an attempt to get a deal.
 {¶ 43} Kimberly Frey testified that she knew both Robertson and appellant. Frey testified that approximately two weeks prior to Robertson's disappearance she had a conversation with appellant about Robertson moving to Bowling Green. Frey testified that appellant stated that if he could not have her no one could. Further, about two weeks after Robertson's disappearance, appellant stated to Frey: "No body, no evidence."
 {¶ 44} Jacquelyn Moore testified that on March 12, 1993, she lived upstairs from appellant. Moore testified that on that evening she heard banging and someone yelling for help from downstairs. Moore testified that following March 12, she noticed that the path to the basement was very muddy. Moore further testified that about a month after Robertson's disappearance she gave a statement to the FBI and police; after they left appellant threatened to burn the house down.
 {¶ 45} During cross-examination Moore was questioned as to why, in 1993, she told police only that she "heard a scream" on an unknown night around the time of Robertson's disappearance. Moore clarified that between 2:00 and 2:30 a.m. on a particular night she heard more noises than usual; however, during redirect examination Moore remembered telling the FBI that either the scream or some noise occurred between 8:00 and 10:30 p.m.
 {¶ 46} Edward Poole, Jr. testified that on February 17, 1999, he told Detective Prosowski that appellant was at his home on the night of March 12, 1993. Poole told Prosowski that appellant had scratches on his face and blood on his clothing and that appellant asked for a change of clothing which Poole gave him.
 {¶ 47} Judy Stoll testified that she and appellant were dating on March 12, 1993. On that date, appellant had borrowed her car and returned it the next day. When appellant returned the vehicle Stoll noticed that it had mud on the sides; Stoll testified that appellant subsequently cleaned the vehicle.
 {¶ 48} During cross-examination, Stoll testified that when appellant returned the vehicle his kids were with him. She also went to appellant's home for a period that day and noticed nothing unusual.
 {¶ 49} Chester Rowe testified that he and Robertson had an intimate relationship from approximately 1986 through 1991. Rowe testified that he and Robertson had photographs taken of them while they were engaged in sexual acts. After Robertson's disappearance, Rowe testified that the photographs were placed in the mail slot of a house he owned.
 {¶ 50} Rowe testified that he was working at the time of Robertson's disappearance. He was questioned by the FBI and police but his house and vehicle were not searched. Rowe denied any involvement in Robertson's murder.
 {¶ 51} Another boyfriend of Robertson, Lance Lee, testified. Lee testified that he saw Robertson a couple of days before her disappearance. Lee indicated that he was interviewed by police but that neither his car nor his house were searched.
 {¶ 52} Appellant presented the following testimony. Sandusky Police Department patrol officer John Cantley testified that on March 21, 1993, he was involved in a voluntary search of appellant's home which uncovered nothing.
 {¶ 53} Sandusky Police Detective Curt Muehling was called again to testify. Muehling testified that in questioning Deb DeLeon about appellant's alleged trip to Chicago in search of Robertson, DeLeon indicated that appellant had been to the house and requested a change of clothing. Muehling stated that DeLeon "was adamant" that the request was made two weeks before Robertson's disappearance. During cross-examination, Muehling stated that at a later date DeLeon and Eddie Poole, Jr., came forward with additional information.
 {¶ 54} FBI agent Charles Holloway was involved in the investigation of Robertson's disappearance. Holloway testified that evidence from Stoll's vehicle was submitted which showed that the blood in the car was Stoll's. Following up with Stoll, Holloway learned that most of the blood stains likely resulted during Stoll's menstrual cycle. Stoll did note that there were some unexplained stains.
 {¶ 55} Holloway testified that he interviewed several of Robertson's past and present boyfriends. Holloway stated that he interviewed Mary Gowitzka who testified that she waited two days before notifying the police because she thought Robertson may have "hooked up" with one of these men. Gowitzka was also concerned that Robertson had returned to her old habits of drug and alcohol abuse.
 {¶ 56} Finally, Harry Roberts testified that he played with Robertson's youngest son when they lived with appellant and when they lived with Gowitzka. Roberts testified that he did not recognize the blanket that Robertson was found wrapped in.
 {¶ 57} On appeal, appellant raises the following four assignments of error:
 {¶ 58} "I. Defendant's murder conviction was legally insufficient.
 {¶ 59} "II. Defendant's murder conviction was against the manifest weight of the evidence.
 {¶ 60} "III. Defendant's tampering with evidence conviction was against the manifest weight of the evidence.
 {¶ 61} "IV. Defendant's conviction for gross abuse of a corpse was against the manifest weight of the evidence."
 {¶ 62} Appellant's first and second assignments of error are related and will be jointly addressed. Appellant argues that his murder conviction is not supported by sufficient evidence and is also against the manifest weight of the evidence.
 {¶ 63} The Ohio Supreme Court has ruled that "the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997),78 Ohio St.3d 380, 386. "Sufficiency" pertains to a question of law as to whether the evidence is legally adequate, as to all the elements of the crime, to support a jury verdict. Id. Reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. However, under a manifest weight standard, an appellate court sits as the "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. Thompkins at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. While an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citations omitted.) Id. Since appellant's assignments of error relating to his murder conviction encompass both sufficiency and manifest weight issues, we must apply both standards.
 {¶ 64} Appellant was convicted of murder, in violation of R.C.2903.02(A). To support this conviction, the state had to prove, beyond a reasonable doubt, that appellant purposely caused the death of Robertson.
 {¶ 65} After a careful review of the evidence presented at trial, and in light of the applicable standards, we conclude that the verdict was supported by sufficient evidence and was not against the manifest weight of the evidence. Appellant stated to Jenny Criner and Kimberly Frey that if he could not have Robertson, no one could. Further, he threatened to kill Connie Wallace, an ex-girlfriend, if she left him and, in fact, rolled her in carpet and threatened to dump her in a landfill. Appellant acted strangely following Robertson's disappearance. He contacted or went to the police daily and told them that he dreamt that Robertson was "cold" and down by the railroad tracks. Appellant could not explain to police why he telephoned Gowitzka's house looking for appellant when he had to go several blocks to get to a telephone when he generally just walked over. Appellant also lied about using Deb DeLeon's son's car to go to Chicago looking for Robertson. Further, though appellant stated that his work boots were stolen and the boots found at Wino's Alley, with Robertson's coat, resembled his and were the same size he claimed they were too small. The state also presented the testimony of Robertson's son who identified the blanket that Robertson was wrapped in as being from appellant's house. Eddie Poole, Jr., testified that on the night of Robertson's disappearance, appellant came to his home and requested a change of clothes. Tracy Barnhart, though her credibility was questionable, testified that in a letter written to her appellant stated "For Linda I did it." The state also presented the testimony of Jacquelyn Moore who stated that appellant threatened to burn down the house due to her cooperation with police. Accordingly, we find that appellant first and second assignments of error are not well-taken.
 {¶ 66} In his third assignment of error, appellant contends that his tampering with evidence conviction is against the manifest weight of the evidence. Specifically, appellant contends that absent the fact that appellant washed Stoll's vehicle after he returned it, the record is devoid of evidence that appellant tampered with evidence relating to the instant case.
 {¶ 67} The elements of the offense of tampering with evidence involved in this case are: (1) that the defendant knows "that an official proceeding or investigation is in progress, or is about to be or likely to be instituted" and (2) that the defendant "conceal[s], or remove[s] any * * * thing, with purpose to impair its * * * availability as evidence in such proceeding or investigation * * *." R.C. 2921.12(A)(1).
 {¶ 68} Discussing the elements of tampering with evidence this court has stated:
 {¶ 69} "Knowledge that a criminal investigation is under way or is imminent, is based upon a reasonable person standard. State v. Diana
(1976), 48 Ohio St.2d 199, 357 N.E.2d 1090, paragraph one of the syllabus, certiorari denied (1977), 431 U.S. 917, 53 L.Ed.2d 227,97 S.Ct. 2180. The focus is on the intent of the defendant rather than the purpose of the criminal investigation. State v. Moore (Jan. 20, 1992), 1992 Ohio App. LEXIS 223, Scioto App. No. 91CA1966, unreported. Furthermore, in order to establish that a defendant tampered with evidence, there must be some evidence connecting the defendant to the tampered evidence. State v. Wooden (1993), 86 Ohio App.3d 23, 27,619 N.E.2d 1132." State v. Smith (Feb. 28, 1997), 6th Dist. No. WD-96-028.
 {¶ 70} In the present case, as noted by appellant, Judy Stoll testified that appellant cleaned her vehicle shortly after returning it. Further, BCI employee Cheryl Silcox testified that Stoll's trunk liner smelled like lemon or "Mr. Clean." There was testimony that Stoll's vehicle was used to transport Robertson's body to the Barnes Nursery location. Paramount to the tampering with evidence charge, however, is the testimony set forth above which demonstrates that appellant buried the body to prevent its detection. Thus, we cannot say that the jury clearly lost its way when it found that appellant tampered with evidence. Appellant's third assignment of error is not well-taken.
 {¶ 71} In appellant's fourth and final assignment of error he argues that his conviction for gross abuse of a corpse is against the manifest weight of the evidence. Appellant asserts that the evidence presented at trial failed to establish a link between appellant and the material that Robertson was found wrapped in. The state contends that the evidence demonstrating that appellant murdered Robertson also supports a finding that Robertson's body was abused. We agree.
 {¶ 72} Robertson's son testified that the blanket Robertson was found wrapped in came from appellant's house. Appellant told police that he had a dream that Robertson was near the railroad tracks and "cold" with a white face and hands. Connie Wallace testified that appellant rolled her in carpet and threatened to take her to the landfill. In light of this testimony and the totality of the testimony presented at trial, we cannot say that the jury lost its way or created a manifest miscarriage of justice when it found appellant guilty of gross abuse of a corpse. Appellant's fourth assignment of error is not well-taken.
 {¶ 73} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Erie County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
Mark L. Pietrykowski, J., Judith Ann Lanzinger, J. and Arlene Singer, J., CONCUR.